**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

STATE OF LOUISIANA, by and through its ATTORNEY GENERAL, LIZ MURRILL,

*Plaintiff,*

v.

KALSHI INC.; KALSHI KLEAR INC.; KALSHI KLEAR LLC; KALSHIEX LLC; KALSHI TRADING LLC; QCX LLC d/b/a POLYMARKET US; BLOCKRATIZE INC.; QC TECH LLC; QC CLEARING LLC; PM DERIVATIVES LLC; ROBINHOOD MARKETS, INC.; ROBINHOOD DERIVATIVES, LLC; FORECASTEX LLC; ROTHERA EXCHANGE AND CLEARING LLC; FORIS HOLDINGS US, INC.; FORIS DAX, INC. d/b/a CRYPTO.COM; NORTH AMERICAN DERIVATIVES EXCHANGE, INC. d/b/a CRYPTO.COM | DERIVATIVES NORTH AMERICA; OG.COM; FORIS DAX FCM, LLC d/b/a OG BROKER; COINBASE GLOBAL, INC.; COINBASE FINANCIAL MARKETS, INC.; LUDLOW EXCHANGE, LLC d/b/a NOVIG; UNDERDOG SPORTS HOLDINGS, INC.; UNDERDOG EXCHANGE DCM, INC.; UDM, LLC d/b/a UNDERDOG PREDICT; IG GROUP HOLDINGS PLC; GEMINI SPACE STATION, INC.; GEMINI TITAN, LLC; GEMINI OLYMPUS, LLC; GEMINI TRUST COMPANY, LLC; and PROPHETX OPCO LLC d/b/a PROPHETX,

*Defendants.*

Case No.: 26-2614

21st Judicial District Court, Parish of Tangipahoa, State of Louisiana, No. 2026-0004268

NOTICE OF REMOVAL TO FEDERAL COURT

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1331, 1441(a), 1442(a), and 1446, Defendant QCX LLC d/b/a Polymarket US (“Polymarket US”), by and through its attorneys, hereby removes the above-

captioned action from the 21st Judicial District Court for the Parish of Tangipahoa, State of Louisiana, to the United States District Court for the Eastern District of Louisiana.[1]

This Notice of Removal is not intended to constitute and should not be construed as constituting the general appearance or appearance on the merits of Defendants in this matter. By filing this Notice of Removal, neither Polymarket US nor any other Defendant waives any defenses it has to this action whether in state or federal court, including but not limited to lack of personal jurisdiction or improper service of process. Polymarket US reserves the right to amend or supplement this Notice of Removal.

In support of removal, Polymarket US states as follows:

## BACKGROUND

1. Prediction markets, exchanges that trade a kind of derivative financial instrument known as event contracts, are an important component of modern, federally regulated financial markets. These markets are "online marketplace[s] that let[] people trade on the predicted outcomes of . . . events." *Clarke v. CFTC*, 74 F.4th 627, 633 (5th Cir. 2023). Hundreds of thousands of U.S. consumers—and millions worldwide—rely on these markets to obtain real-time, accurate information about consequential events in politics, finance, technology, news, and sports. Through the Commodity Exchange Act ("CEA"), Congress placed these markets squarely within a comprehensive federal regulatory regime and vested exclusive supervisory authority in the Commodity Futures Trading Commission ("CFTC"). This exclusive jurisdiction, the en banc Fifth Circuit has said, "supersedes state as well as federal agencies." *Point Landing, Inc. v. Omni*

[1] Defendants Blockratize Inc. ("Blockratize," QC Tech LLC ("QC Tech"), QC Clearing LLC ("QC Clearing"), and PM Derivatives LLC ("PM Derivatives"), collectively "the Polymarket entities," consent to this removal. Consent of the other defendants to the above-captioned action is not required because removal is proper under Section 1442(a) and no defendant has been "properly joined and served." 28 U.S.C. § 1446(b)(2)(A).

*Capital Int'l, Ltd.*, 795 F.2d 415, 420 (5th Cir. 1986) (en banc), *aff'd on other grounds sub nom. Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987). Congress chose to entrust regulatory authority to the CFTC alone because "effective regulation[] . . . must be administered on a relatively consistent and uniform basis." *Id.* at 422.

2. Polymarket US operates a federally licensed designated contract market that offers event contracts. Event contracts are a type of "swap," a financial contract where two parties agree to exchange—swap—payments with each other based on a pre-agreed formula, such as the price of crude oil or interest rates. For event contracts, the payoff "may be based on eventualities and measures as varied as the world's population in the year 2050, the results of political elections, or the outcome of particular entertainment events." *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669, 25669 (May 7, 2008). Polymarket US offers event contracts subject to and in compliance with the CFTC's regulatory oversight and federal law.

3. The CFTC itself has confirmed through litigation, amicus briefs, and public statements that event contracts traded on designated contract markets fall squarely within its exclusive federal authority. Other courts have granted requests from the CFTC to enjoin state interference with event-contract markets. *See, e.g.*, *United States v. Minnesota*, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026); *Coinbase Fin. Mkts. Inc. v. Raoul*, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026). The Third Circuit also agrees that regulatory authority over event contracts belongs to the CFTC, not the States. *See KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

4. The CFTC recently reaffirmed that event contracts fall within the CEA's exclusive federal framework. On October 19, 2026, in light of the "debate regarding the scope of the

[CFTC]'s jurisdiction under the [CEA], particularly as it relates to event contracts," the CFTC proposed to further clarify that Polymarket US's event contracts are swaps under the CEA. *Further Definition of "Swap" — Inclusions*, 91 Fed. Reg. 66022, 66025 (Oct. 19, 2026) ("*NPRM*"). That same day, the agency issued an interim final rule codifying the CFTC's "longstanding position that," unlike event contracts, "casino-style gambling products, including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps and do not fall within the CFTC's jurisdiction." *Further Definition of "Swap" to Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65969, 65971 (Oct. 19, 2026) ("*IFR*"). The CFTC has also recognized that event contracts can hedge risk, facilitate price discovery, and generate real-time information about future events. *See Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35806, 35807 (June 12, 2026) ("*Public Interest Determinations*").

5. The State of Louisiana has chosen to invade the CFTC's exclusive jurisdiction anyway. On November 12, 2026, without service, notice, or the opportunity to be heard, the State sued Defendants in Louisiana's 21st Judicial District Court, Parish of Tangipahoa, and was granted an *ex parte* temporary restraining order purporting to require that Polymarket US shut down federally regulated operations in Louisiana. Ex. A ("Petition" or "Pet.") ¶ 249; Ex. B ("TRO Motion"); Ex. C ("State Court Order") at 2–3. This order directly conflicts with federal law and intrudes upon the CFTC's exclusive and comprehensive authority to regulate exchange-traded derivatives markets nationwide. The State also seeks restitution, disgorgement, and civil penalties, all of which would further conflict with federal law.

6. CFTC-licensed exchanges like Polymarket US are subject to exclusive federal oversight, not state regulation. Allowing state regulators to shut down derivatives trading by

rushing to state courts would fracture the uniform national framework that Congress designed and that the CFTC alone may police.

7. This Court has jurisdiction under 28 U.S.C. § 1442 because Plaintiff's suit directly targets Polymarket US's "act[ions] under" the CFTC. 28 U.S.C. § 1442(a)(1). In operating a designated contract market, Polymarket US acts as a "self-regulatory organization" exercising delegated authority from the CFTC. 17 C.F.R. § 1.3. As a self-regulatory organization, Polymarket US does not merely comply with the federal regulatory regime. It is a "front-line regulator[]" that assists the CFTC by performing regulatory functions the federal agency itself would otherwise carry out. CFTC Staff Advisory at 1, CFTC Ltr. No. 26-08 (Mar. 12, 2026). And those functions—regulating market access, certifying event contracts for listing, and promulgating and enforcing rules to promote fair and equitable trading and to protect the market and market participants—are exactly what Plaintiff's suit challenges. Because Plaintiff's state-court lawsuit seeks to interfere with the federal government's exclusive authority and the system of self-regulation Congress created, Polymarket US is entitled to have its federal preemption defense in federal court.

8. This Court also has jurisdiction under 28 U.S.C. § 1331. Plaintiff's state-law claims necessarily turn on disputed questions about the meaning and scope of the federal CEA. To succeed on any of its claims, Plaintiff must show that Polymarket US's event contracts are illegal gambling transactions and not "futures, options, commodities, or other similar instruments or transactions occurring on a . . . commodities exchange." La. Rev. Stat. 14:90.3(M). Doing so will necessarily require Plaintiff to grapple with the status, authorization, and legality of Polymarket US's event contracts under the CEA. And Plaintiff's own theory confirms that what

Plaintiff calls "gambling" is what the CEA calls "swaps." Again, this Court is the proper forum to resolve those exceptionally important questions of federal law.

## I. Federal Regulatory Authority

9. Defendant Polymarket US operates a federally regulated derivatives exchange on which users nationwide trade event contracts—derivative financial instruments that constitute "swaps" under the CEA. *See* 7 U.S.C. § 1a(47)(A)(ii); 91 Fed. Reg. at 66025.

10. On July 9, 2025, the CFTC formally approved Polymarket US as a designated contract market under the CEA—a designation reflecting an extensive federal finding that Polymarket US satisfies stringent requirements that govern derivatives trading on federal exchanges, including with respect to market integrity, access, transparency, financial safeguards, surveillance, and customer protection. *See* 7 U.S.C. §§ 7(a), 7(d), 8(a).

11. When it comes to exchange-traded event contracts, Congress could not have been clearer: The CFTC exercises "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market. 7 U.S.C. § 2(a)(1)(A). That exclusivity leaves no room to target federally regulated derivatives markets with state licensing regimes, enforcement actions, or injunctive relief.

12. Polymarket US operates in compliance with the CFTC's comprehensive regulatory regime, including the CEA's 23 core principles and all CFTC rules governing market participant access, contract design, surveillance, enforcement, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.

## II. Louisiana's Suit Directly Conflicts With Federal Law

13. Despite this exclusive federal regime, on November 12, 2026, the State of Louisiana sued Polymarket US in state court, filing a Petition For Temporary Restraining Order,

Preliminary Injunction, Civil Penalties, And Other Relief. *See* Pet. at 1. Plaintiff made no apparent effort to notify Defendants of the filing of the Petition. Plaintiff proceeds under state law on the theory that federally regulated event contracts constitute unlawful gambling. The same day, Plaintiff obtained an *ex parte* temporary restraining order against Defendants.

14. The Petition purports to state a claim against Polymarket US under La. Stat. Ann. §§ 14:90, 14:90.3; La. Stat. Ann. §§ 27:604, 27:605, 27:625; the Louisiana Unfair Trade Practices Act, La. Stat. Ann. § 51:1401 *et seq.*; La. Stat. Ann. § 51:411; and La. Civ. Code Ann. art. 2298, for Polymarket US's offering of *federally regulated* event contracts subject to the CFTC's exclusive jurisdiction. Pet. ¶¶ 71, 159, 214–48.

15. Plaintiff's theory is that Polymarket US's activities constitute "gambling" because they involve "the intentional conducting, or directly assisting in the conducting, as a business, of any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit." Pet. ¶ 58 (quoting La. Stat. Ann. § 14:90(A)(1)(a)). Plaintiff further contends that Polymarket US's event contracts are unlicensed "sports wagers," meaning "a sum of money or representation of value risked by a player on an occurrence associated with a sports event for which the outcome is uncertain." Pet. ¶¶ 68, 180 (quoting La. Stat. Ann. § 27:602(A)(23)). In Plaintiff's view, offering those event contracts is unlawful under Louisiana's law prohibiting gambling, La. Stat. Ann. § 14:90; gambling by computer, La. Stat. Ann. § 14:90.3(B); operating a sports book without a license issued by the Louisiana Gaming Control Board, La. Stat. Ann. § 27:604(A)(1); and acting as a sports wagering platform provider without a permit, La. Stat. Ann. § 27:605(A)(1). Pet. ¶¶ 6, 66, 71, 213, 217–19, 221. Plaintiff also asserts that Polymarket US has not paid the tax on net sports wagering proceeds imposed by La. Stat. Ann. § 27:625, Pet. ¶¶ 103, 244, and that its conduct is an unfair and deceptive trade practice under La. Stat. Ann. § 51:1405,

a violation of La. Stat. Ann. § 51:411, and unjust enrichment under La. Civ. Code Ann. art. 2298. Pet. ¶¶ 214–48.

16. Plaintiff requested a temporary restraining order to halt Polymarket US's federally regulated activity. Mere hours after the Petition was purportedly filed, in the midst of widespread Microsoft outages and before the Petition had been processed online, served on any Defendant, or otherwise made available, the state court granted the *ex parte* order. That order directs Polymarket US to cease "offering any 'event contract'" within Louisiana. State Court Order at 2.

17. As further relief, Plaintiff requests (1) a preliminary injunction and permanent injunction enjoining and restraining Polymarket US from operating in or offering products or services to persons located in Louisiana or, in the alternative, from offering event contracts on sports events, awards events, political events, and elections to persons located in Louisiana, (2) an injunction against false advertising in violation of La. Stat. Ann. § 51:411 and any other violation of the Louisiana Unfair Trade Practices Act, (3) reimbursement of the Attorney General's costs and expenses of investigating and prosecuting this action, including attorney's fees under La. Stat. Ann. § 51:1408, (4) civil penalties and damages allowable under law, including forfeiture under La. Stat. Ann. § 14:90.3(J), (5) civil fines of not less than $500 and not more than $2,500 for each violation of Louisiana's false-advertising law, La. Stat. Ann. § 51:411(E), (6) restitution, disgorgement, damages, and penalties, and (7) any such other and further relief as the Court deems proper. Pet. ¶¶ 249–50.

18. Polymarket US will demonstrate that Plaintiff's Petition fails as a matter of law because event contracts may be lawfully purchased and traded in Louisiana on a designated contract market. Polymarket US's event contracts are not subject to State regulation as "gambling" or "wagering." Congress expressly granted the CFTC—not the States—"exclusive jurisdiction"

over exchange-traded event contracts. 7 U.S.C. § 2(a)(1)(A). It authorized the CFTC—not the States—to determine whether event contracts involve "gaming" and whether they may be listed or must be prohibited in the public interest. 7 U.S.C. § 7a-2(c)(5)(C). And it did so to ensure that regulation of "market participants" remains "under the oversight of the *Commission*," 7 U.S.C. § 5(b) (emphasis added), and no "other regulatory agencies," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982).

19. Louisiana's attempt to override and usurp the CFTC's exclusive federal authority through a state-law enforcement action conflicts with the regime Congress established.

**FIRST GROUND FOR REMOVAL: FEDERAL OFFICER REMOVAL**

20. The federal officer removal statute guarantees Polymarket US the right to have its federal preemption defense heard by a federal court. As a self-regulatory organization, Polymarket US exercises delegated authority under the supervision of the CFTC to carry out functions the CFTC itself would otherwise perform. And Plaintiff's suit directly targets the way Polymarket US exercises that delegated authority.

21. The federal officer removal statute authorizes removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The Supreme Court has emphasized that "the statute must be 'liberally construed'" and that "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007). Likewise, "[t]he phrase 'relating to' sweeps broadly," and "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 11 (2026). The Fifth Circuit, too, has confirmed that federal officer removal

is "not narrow or limited" and, unlike most questions of federal jurisdiction, "must be 'liberally construed.'" *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 195 (5th Cir. 2019).

22. Federal officer removal "is an exception to the well-pleaded complaint rule," allowing "suits against federal officers to be removed despite the nonfederal cast of the complaint." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (alterations adopted); *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020) ("[S]ection 1442(a) permits an officer to remove a case even if no federal question is raised in the well-pleaded complaint, so long as the officer asserts a federal defense in the response."). When assessing removal, courts credit the removing party's plausible allegations, *Plaquemines*, 608 U.S. at 12, including the defendant's "theory of the case," for purposes of the "jurisdictional inquiry," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999).

23. Polymarket US satisfies the three-part test for federal officer removal because (1) it is "a person" acting under the CFTC and its officials, (2) this suit is "for or relating to" acts Polymarket US takes under the color of that federal authority, and (3) Polymarket US has a "colorable federal defense." *Plaquemines*, 608 U.S. at 6. Because Section 1442 authorizes removal of the "civil action," once those requirements are met, the entire action belongs in federal court. 28 U.S.C. § 1442(a)(1); *accord Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 463 (5th Cir. 2016).

24. Notably, Section 1442 does not require Polymarket US to show that the CFTC or any CFTC official specifically directed the precise transaction, event-contract listing, or state-specific access decision Plaintiff challenges. The statute separates two questions: whether Polymarket US acts under a federal officer, and whether this suit is "for or relating to" acts taken under color of that federal authority. *Plaquemines* confirms that the second requirement is satisfied

by a non-tenuous relationship between the challenged conduct and the defendant's federal duties; it does not collapse the acting-under inquiry into a requirement that the agency specifically command the challenged act. 608 U.S. at 11–12. Here, Polymarket US acts under the CFTC when it performs federally delegated functions as a designated contract market, and Plaintiff's suit relates to those functions because Plaintiff targets Polymarket US's exercise of delegated authority to regulate market access, contract listing, trading, surveillance, compliance, enforcement, and market safeguards.

25. *First*, Polymarket US is a "person acting under" the CFTC and its officials. 28 U.S.C. § 1442(a)(1). A limited liability company is a "person" under the removal statute. 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *Savoie*, 817 F.3d at 461. Polymarket US acts under the CFTC because it "assist[s]," and "help[s] carry out, the duties or tasks of" the agency. *Watson*, 551 U.S. at 152.

26. Polymarket US operates its designated contract market subject to the CFTC's direction and "an unusually close [relationship] involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153. Polymarket US does more than merely comply with the CEA's highly detailed regulatory scheme; as a contract market, it exercises delegated federal authority to "promulgate[] rules and regulations" governing market participants. *Merrill Lynch*, 456 U.S. at 382.

27. To operate as a designated contract market, Polymarket US is charged with establishing and enforcing various rules to carry out the CEA's objectives, all under the CFTC's oversight. For example, Polymarket US's conduct and rules must comply with the CEA's 23 core principles and all CFTC rules governing market access, contract design, surveillance, enforcement,

financial safeguards, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151. The CFTC has "sweeping authority" to enforce the CEA and its regulations. *CFTC v. Schor*, 478 U.S. 833, 842 (1986). The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). It may suspend or revoke a contract market's designation, 7 U.S.C. §§ 7b, 8(b), bring administrative enforcement actions, *id.* §§ 9, 13b, and sue in federal court for injunctive relief, rescission, trading bans, registration bans, and other relief, *id.* § 13a-1.

28. The relationship between Polymarket US and the CFTC goes well beyond the fact of federal regulation alone to include tasks the federal government would otherwise perform. The CEA creates "a system of effective self-regulation of trading facilities . . . under the oversight of the Commission." 7 U.S.C. § 5(b). CFTC regulations define contract markets as "self-regulatory organization[s]." 17 C.F.R. § 1.3.

29. Congress granted "self-regulatory organizations such as contract markets . . . a form of delegated [government] discretion" to adopt, implement, and enforce regulatory protections—authority that, without contract markets, the CFTC would otherwise exercise itself. *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022); *accord Jackson v. Avondale Indus., Inc.*, 469 F. Supp. 3d 689, 708 (E.D. La. 2020) (finding removal proper under § 1442(a) where a private party "helped the government perform a job that it would otherwise have to perform itself"); 17 C.F.R. § 1.3 (including contract markets within the definition of "self-regulatory organization"); *Prediction Markets: Public Interest Determinations*, 91 Fed. Reg. 35806, 35843 (June 12, 2026) (explaining that designated contract markets "are required to operate

as self-regulatory organizations, subject to Commission oversight, with statutory duties to enforce the rules adopted by their own governing bodies”).

30. Courts, including the Fifth Circuit, have consistently held that “self-regulatory organizations” with federally “delegated power” “work in quasi-governmental capacities.” *Austin Mun. Sec., Inc. v. Nat’l Ass’n of Sec. Dealers, Inc.*, 757 F.2d 676, 681, 689 (5th Cir. 1985) (self-regulatory organization “is entitled to absolute immunity for its role in disciplining its members and associates”); *D’Alessio v. New York Stock Exch., Inc.*, 258 F.3d 93, 106–07 (2d Cir. 2001) (stock exchange, “as a [self-regulatory organization], stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring compliance with those laws” and is therefore “entitled to the same immunity”); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (holding that self-regulatory organization was immune for actions exercising authority “delegated by the SEC”); *Mohlman v. Fin. Indus. Regul. Auth., Inc.*, 2020 WL 905269, at *3–4 (S.D. Ohio Feb. 25, 2020) (collecting cases for same proposition), *aff’d on other grounds*, 977 F.3d 556 (6th Cir. 2020). The relationship between Polymarket US and the CFTC therefore goes well beyond that of a highly regulated entity subject to comprehensive supervision.

31. In its role as a self-regulatory organization, Polymarket US is specifically charged with a broad array of functions. For example, a designated contract market is required to “establish, monitor, and enforce compliance with the rules of the contract market,” including “access requirements,” “the terms and conditions of any contracts to be traded on the contract market,” and “rules prohibiting abusive trade practices on the contract market.” 7 U.S.C. § 7(d)(2).

32. A designated contract market also has the “responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures.” 7 U.S.C. § 7(d)(4).

33. A designated contract market likewise must "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant." 7 U.S.C. § 7(d)(12). To that end, it also must "maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information" "to assist in the prevention of customer and market abuses." *Id.* § 7(d)(10).

34. These rules establish important protections for derivatives markets, market participants, and the general public.

35. Polymarket US also performs federally supervised rule- and product-listing functions. To implement or revise a rule, a designated contract market must either submit the rule for CFTC approval or certify that the rule complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). The CFTC may allow the rule to go into effect, or it may stay the rule's certification pending further review. *Id.* § 7a-2(c)(2)–(3).

36. Similarly, to list new event contracts, the entity must either submit the event contract for CFTC approval or certify that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). The CFTC retains authority to investigate, stay, or amend the contract after it has been listed. 17 C.F.R. § 40.2(c). If the CFTC determines that a proposed "[e]vent contract" involves certain subjects, including "gaming," it has the discretion to prohibit the listing if the contract would be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

37. The CFTC's retained authority confirms the "acting under" relationship. Federal agencies necessarily retain ultimate authority over delegated regulatory functions, and Section 1442 does not require a private entity to exercise unfettered government power. The CFTC's

authority to review, stay, amend, prohibit, or require changes to the rules and event-contract listings on a designated contract market—and to suspend or revoke a contract market's designation—shows that Polymarket US performs federal market-regulatory work under federal subjection, guidance, and control. That is the relationship *Watson* describes as "acting under": assistance to a federal superior in carrying out federal tasks, not independent private action. *Watson*, 551 U.S. at 151–54.

38. Once contracts are listed, designated contract markets must "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process." 7 U.S.C. § 7(d)(9)(A). They must also "establish, monitor, and enforce compliance with" rules relating to "access requirements," *id.* § 7(d)(2)(A)(i), and "establish and enforce rules . . . to promote fair and equitable trading on the contract market," *id.* § 7(d)(12)(B). To that end, CFTC regulations impose additional "impartial access" requirements, mandating that a contract market provide market participants with nondiscriminatory access and adopt and fairly enforce rules governing denials, suspensions, and terminations of access. 17 C.F.R. § 38.151(a)–(c); *see DCM Impartial Access Requirements*, 91 Fed. Reg. 72407, 72409 (Nov. 10, 2026) ("*Impartial Access*").

39. In all of these respects, a designated contract market exercises authority delegated by the federal government, "perform[ing] a job that . . . the Government itself would have had to perform." *Watson*, 551 U.S. at 154. Because Polymarket US's actions involve "an effort to assist, or to help carry out, the duties or tasks of the federal superior," the CFTC, Polymarket US "'act[s] under'" that agency. *Id.* at 152.

40. *Second*, Plaintiff's lawsuit is "for or relating to" actions Polymarket US takes under the authority, supervision, and jurisdiction of the CFTC. The "for or relating to" element "sweeps

broadly." *Plaquemines*, 608 U.S. at 11. "One thing can relate to another even if the connection is indirect," and "even without a strict causal relationship." *Id.* (internal quotation marks omitted). *Plaquemines* confirms that the defendant need not show that the federal government specifically required or strictly caused the challenged conduct. 608 U.S. at 11. It is enough that the defendant plausibly alleges a close relationship between the challenged conduct and the performance of federal duties. *Id.* at 11–12.

41. That requirement is easily satisfied here. Plaintiff does not challenge collateral commercial conduct remote from Polymarket US's federal role. Plaintiff challenges activity of the designated contract market itself: Polymarket US's offering and listing of federally regulated event contracts, its provision of access to its federally regulated exchange, and the safeguards and rules through which it operates that exchange. Pet. ¶¶ 3–4, 86, 94, 96–100, 160–65, 171, 173, 177, 179–80, 193–201, 204–05. In particular:

a. Federal law requires designated contract markets like Polymarket US to "establish, monitor, and enforce [its users'] compliance" with its rules, including by setting "the terms and conditions of any contracts to be traded on the contract market" and "detect[ing], investigat[ing], and apply[ing] appropriate sanctions" to violators. 7 U.S.C. § 7(d)(2)(A)–(B). But Plaintiff takes issue with—and attempts to alter—the types of event contracts offered on Polymarket US's platform and seeks to impose liability on Polymarket US based on event contracts that are allegedly illegal under state law. *See* Pet. ¶¶ 3–4, 7, 94, 96–99, 101–03, 160–65, 171, 173, 175–81, 187–88, 213.

b. Federal law directs Polymarket US to "establish, monitor, and enforce compliance" with "access requirements." 7 U.S.C. § 7(d)(2). The CFTC has taken the view that

these requirements "may not . . . intentionally exclude or discourage participation . . . based on domestic geographic location," such as by "permitting participants from one region or State within the United States while barring those from another." *Impartial Access*, 91 Fed. Reg. at 72409. But Plaintiff says that Polymarket US's offering its platform and operating in Louisiana constitutes "violations of Louisiana law" and "illegal operat[ion of] online sports wagering platforms in Louisiana without a permit." Pet. ¶¶ 14, 76. On that basis, Plaintiff seeks to alter Polymarket US's terms of access, including by requiring it to stop serving, or to geofence out, persons located in Louisiana. Pet. ¶ 249(a). Similarly, Polymarket US permits those who have "attained the age of majority in [their] state and/or country of residence" to transact on the exchange. Individual Participant and Clearing Member Agreement § 2(1).[2] Plaintiff, on the other hand, wants to restrict trading for those under 21. Pet. ¶¶ 100, 196, 198.

c. Federal law requires Polymarket US to "establish, monitor, and enforce [its users'] compliance" with its "rules prohibiting abusive trade practices on the contract market" and to "prevent manipulation" and "price distortion . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. §§ 7(d)(2)(A), 7(d)(4); *see also* 17 C.F.R. § 38.651 (requiring Polymarket US to "have and enforce rules that are designed to promote fair and equitable trading and to protect the market and market participants from abusive practices"). Plaintiff nonetheless claims that Polymarket US's platform can harm its users' "financial, economic, emotional, and physical well-being." Pet. ¶¶ 192, 201.

[2] https://polymarketexchange.com/files/legal/latest/participant-agreement.

42. In other words, the connection "between [Polymarket US's] challenged conduct and the performance of its federal duties" is hardly "tenuous, remote, or peripheral"—it is close and direct. *Plaquemines*, 608 U.S. at 12. To be sure, "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct," *id.* at 11, but here, Polymarket US's federal obligations do precisely that. The suit targets the precise federally delegated functions that make a contract market a contract market: market access, contract listing, rulemaking, surveillance, and enforcement under CFTC oversight.

43. *Third*, Polymarket US has a "colorable federal defense." *Plaquemines*, 608 U.S. at 6; *see Butler*, 926 F.3d at 195 ("[Section] 1442 does not require a person acting under a federal official to win his case before he can have it removed." (cleaned up)). Plaintiff's claims are preempted by federal law, which qualifies as a "*colorable*" federal defense for the purposes of Section 1442. *Butler*, 926 F.3d at 200.

44. Preemption follows from the express language of the CEA, which grants "exclusive jurisdiction" over exchange-traded swaps to the CFTC, not state regulators. 7 U.S.C. § 2(a)(1)(A); *accord Point Landing, Inc.*, 795 F.2d at 420. Federal law authorizes the CFTC, not state regulators, to determine whether event contracts involve "gaming" and whether such contracts may be listed on federally regulated exchanges. 7 U.S.C. § 7a-2(c)(5)(C). The Third Circuit has also held that the CEA "preempts state laws that directly interfere with swaps traded on [contract markets]," and that event contracts traded on a CFTC-licensed contract market are "swaps" subject to the CFTC's exclusive jurisdiction. *Flaherty*, 172 F.4th at 226–28. Other courts have reached the same conclusion. *E.g.*, *Minnesota*, 2026 WL 2150211, at *14; *Raoul*, 2026 WL 2969682, at *18. Additionally, the CFTC has since "expressly clarif[ied]" that event contracts are swaps, *NPRM*,

91 Fed. Reg. at 66025, and has confirmed that sportsbook wagers, by contrast, "are not swaps," *IFR*, 91 Fed. Reg. at 65971.

45. Plaintiff's attempt to impose state gambling, sports-wagering, licensing, consumer-protection, nuisance, or similar laws on Polymarket US's federally designated exchange directly conflicts with the federal scheme. *See Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1157 (7th Cir. 1992) (state efforts to interfere with "the operation of a contract market" are preempted by the CEA).

46. Through the amendments to the CEA Congress "create[d] a uniform regulatory scheme." *Point Landing*, 795 F.2d at 422. And Congress enacted the federal officer removal statute to prevent the use of "[s]tate-court proceedings" to circumvent "unpopular federal laws." *Watson*, 551 U.S. at 150.

47. This case exemplifies the danger federal officer removal was designed to prevent. Plaintiff received a temporary restraining order from a Louisiana state court barring Polymarket US from offering event contracts on its federally regulated designated contract market to Louisiana residents. That order fractures national derivatives markets and undermines the uniformity Congress sought to achieve through "a system of effective self-regulation of trading facilities . . . under the oversight of the [CFTC]." 7 U.S.C. § 5(b). Congress enacted federal officer removal precisely to "protect the Federal Government" and those "who lawfully assist" it from such "interference with [their] operations." *Watson*, 551 U.S. at 150–51.

48. This Court can and should recognize its jurisdiction under Section 1442(a)(1) to ensure that Polymarket US's preemption defense is fairly and fully litigated.

**SECOND GROUND FOR REMOVAL: FEDERAL QUESTION JURISDICTION**

49. This Court has removal jurisdiction in "any civil action" over which it has original jurisdiction, 28 U.S.C. § 1441(a), and it has original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States," *id.* § 1331.

50. This "case arises under federal law" because Plaintiff's claims require the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

51. Polymarket US operates a lawful, nationwide designated contract market subject to the CFTC's exclusive jurisdiction. Likewise, QC Clearing LLC operates a lawful, federally regulated derivatives clearing organization ("DCO"), and PM Derivatives LLC operates a lawful, federally regulated futures commission merchant ("FCM"). The core question is whether Plaintiff may nonetheless impose its state statutory regime on Polymarket US's federally licensed derivatives exchange and related market participants based on transactions listed, traded, cleared, and brokered by these federally regulated entities. *See* Pet. ¶¶ 22–26, 93, 169, 181, 249(a); State Court Order at 2–3 (restraining listing, accepting, clearing, settling, and brokering).

52. That question cannot be answered without interpreting the scope and effect of the CFTC's exclusive jurisdiction under the CEA.

53. Plaintiff does not dispute that QC Clearing LLC is a registered DCO with the CFTC, that PM Derivatives LLC is a federally registered FCM, or that the CFTC has authorized the listing, trading, and clearing of the event contracts executed on Polymarket US's designated exchange. Pet. ¶¶ 22–26, 105, 118. But Plaintiff claims that it—not Congress or the CFTC—may

decide which federally regulated instruments are legitimate "'swaps'" and which may be "reclassif[ied] or redefine[d]" using that mere "misnomer under the guise of federal regulation." *Id.* ¶ 160.

54. These event contracts are an especially unusual choice of target. As Plaintiff concedes, "'[e]vent contracts' are investment instruments" that "have existed in the United States since the nineteenth century." Pet. ¶ 161. "[S]tructured as binary options," event contracts provide "a straightforward way of hedging" against various specified "event[s]." *Id.* ¶¶ 161, 163. And federal law expressly entrusts the CFTC—not Plaintiff—with the task of determining whether swaps "involve[] . . . gaming." 17 C.F.R. § 40.11(a)(1); *see* 7 U.S.C. § 7a-2(c)(5)(C)(i) (similar); *Public Interest Determinations*, 91 Fed. Reg. at 35815–16, 35835–37, 35853, 35870–71 (setting out the CFTC's view that sports-related event contracts may be listed on designated contract markets and proposing new regulations to supply further clarity); *NPRM*, 91 Fed. Reg. at 66027 (same).

55. All of Plaintiff's claims boil down to its theory that Defendants are engaged in illegal gambling. *See* Pet. ¶¶ 211–13 (Count One), 216–21 (Count Two), 223–27 (Count Two), 236 (Count Three), 243–46 (Count Four). Plaintiff misrepresents Louisiana law to suggest otherwise. According to Plaintiff, "Louisiana fully suppresses all gambling that is not authorized," Pet. ¶ 192, and "anyone who engages" in authorized "'form[s] of gaming, gambling, or wagering' . . . must be licensed and regulated by the relevant state regulator," *id.* ¶ 56 (quoting La. Const. art. XII, § 6(C)(1)(a)). Therefore, Plaintiff alleges, "[t]he platforms' clever word play doesn't change the fact that gambling is illegal in Louisiana unless the Legislature specifically authorizes it." *Id.* ¶ 8 (citing La. Const. art. XII, § 6(C)).

56. That is not Louisiana law. "From a mere reading of" Louisiana's constitution, "it is obvious" that Section 6, Article XII of the Louisiana Constitution "is not self-executory." *Gandolfo v. La. State Racing Comm'n.*, 78 So. 2d 504, 507 (La. 1954) (discussing Section 6's precursor in the 1921 constitution). The very provision that comes before section 6(C) provides that "[g]ambling shall be *defined by and suppressed by* the legislature." La. Const. art. XII, § 6(B) (emphasis added). Even "when construing more restrictive constitutional provisions contained in predecessor constitutions"—before the legislature was granted the authority to "define" gambling—the Louisiana Supreme Court had always held that, "in the absence of legislative action, 'gambling' has been permitted and indeed licensed, notwithstanding the constitutional provision." *Polk v. Edwards*, 626 So. 2d 1128, 1137, 1138 (La. 1993) (citing *City of Shreveport v. Maloney*, 31 So. 702 (La. 1902)). That was true even when "'[g]ambling in futures'" was explicitly "'declared to be against public policy; and the Legislature shall pass laws to suppress it.'" *Gandolfo*, 78 So. 2d at 507 (quoting Article 19, Section 8 of the Louisiana Constitution of 1921). Then, as now, "[i]n the absence of any legislation there is no prohibitory law on the subject." *Id*. at 507; *Polk*, 626 So. 2d at 1138.

57. The upshot is that, if what Plaintiff deems gambling "is not prohibited by law, [it] is accordingly not illegal, [and] it is not a nuisance per se; and [P]laintiff[] [is] not entitled to the injunction which [it] seek[s]," regardless of whether the alleged gambling is in the form of betting, wagering, or exchange-traded derivatives. *Gandolfo*, 78 So. 2d at 514. Despite the breadth of Plaintiff's preferred definition of "gambling," *see* Pet. ¶ 58 (quoting La. Rev. Stat. 14:90(A)(1)(a)), "'[t]he act[s] prohibited in [Louisiana] statute[s] relate[] to gambling and to 'betting books' and to horse races [or other sports] to the extent *only* that they come within the

gambling denounced by the statute,'" *Gandolfo*, 78 So. 2d at 512 (emphasis added) (quoting *State v. Scheffield*, 48 So. 932, 934 (La. 1909)).

58. Take Plaintiff's first cause of action for injunctive relief against violations of "La. R.S. 14:90, 14:90.3, 27:604, and any related gaming provisions," Pet. ¶ 213—the basis for the state court's *ex parte* restraining order, *see* State Court Order at 2 (granting *ex parte* restraining order on the conclusion that "Defendants are currently violating La. R.S. 14.90.3 among other Louisiana laws"). The Louisiana Legislature has defined what prohibited "gambling in Louisiana is not," *id.* ¶ 13, very clearly: "Nothing in this Section shall prohibit, limit, or otherwise restrict the purchase, sale, exchange, or other transaction related to stocks, bonds, futures, options, commodities, or other similar instruments or transactions occurring on a stock or commodities exchange, brokerage house, or similar entity." La. Rev. Stat. 14:90.3(M); *see* La. Rev. Stat. 14:90.7(G) (excluding the same from prohibited "[g]ambling by electronic sweepstakes device" in identical terms); *Gandolfo*, 78 So. 2d at 508–09 ("[La. Rev. Stat. ] 14:90 and [the State's gambling laws outside Title 14] must be construed together, as they are part of one legislative act.").

59. Under Louisiana law, therefore, it is not enough for a plaintiff to assert that particular contracts are "nothing but gambling." *Gandolfo*, 78 So. 2d at 511 (quoting *Maloney*, 31 So. 702). Instead, the plaintiff must establish that the challenged "act[s]" are "prohibited by statute," *id.* (quoting *Maloney*, 31 So. 702), and are not "futures, options, commodities, or other similar instruments or transactions occurring on a stock or commodities exchange," La. Rev. Stat. 14:90.3(M), La. Rev. Stat. 14:90.7(G). And because "the law presumes" that such transactions "do not . . . violate the law"—and are instead "sanctioned by it"—the party alleging it is a "'wagering contract[] or illegal'" bears "the burden . . . to prove his allegation." *Stewart Bros. v.*

*Beeson*, 148 So. 703, 707 (La. 1933); *cf. Flaherty*, 172 F.4th at 227 (contracts self-certified for trading on designated exchanges are "presumptively approved under federal law").

60. To succeed on its first claim for relief, then, Plaintiff must prove that Polymarket US's event contracts are unlawful wagers—*i.e.*, not "futures, options, commodities, or other similar instruments or transactions occurring on a stock or commodities exchange." La. Rev. Stat. 14:90.3(M), La. Rev. Stat. 14:90.7(G). Carrying that burden necessarily requires Plaintiff to contend with federal law, the law that governs transactions on federally regulated exchanges.

61. "As a result, whether the contracts at issue are unlawful gambling contracts—or instead federally authorized event contracts—cannot be resolved by reference to [state] law alone," *Ga. Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026). Rather, "the vindication of [Plaintiff's] right[s] under state law necessarily turn[s] on some construction of federal law," *Bd. of Comm'rs of Se. La. Flood Prot. Auth.—E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 722 (5th Cir. 2017)—here, the meaning of the CEA and the scope of the CFTC's exclusive jurisdiction.

62. Under the CEA, which governs the validity of the event contracts at issue here, the event contracts are authorized, lawful swaps. The CEA defines "swap" broadly, 7 U.S.C. § 1a(47)(A), as any contract "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," *id.* § 1a(47)(A)(ii), or "that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv). The CFTC has confirmed that Polymarket US's event contracts satisfy both definitions. 91 Fed. Reg. at 65974 (subdivision (ii)); 91 Fed. Reg. at 66027 (subdivision (iv)). The CFTC also has the

authority to determine whether a listed contract "involve[s]" "gaming" and, if so, whether to prohibit the listing. 7 U.S.C. § 7a-2(c)(5)(C)(i). But the CFTC has not prohibited the listing of any event contracts relevant here—and, unless prohibited, "swaps are swaps whether they are used to gamble." *Raoul*, 2026 WL 2969682, at *10; *accord Flaherty*, 172 F.4th at 227.

63. It is therefore "impossible to determine whether" Defendants' event contracts are prohibited or authorized "without deciding whether their actions were governed by a valid administrative [sanction] issued by the [CFTC]." *Hughes v. Chevron Phillips Chem. Co.*, 478 F. App'x 167, 170 (5th Cir. 2012). And as a result, "Plaintiff's ability to sustain a claim upon which relief may be granted necessarily depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive jurisdiction." *Ga. Gambling*, 2026 WL 279375, at *3.

64. Plaintiff's own allegations confirm the federal issue at the heart of its claims. Plaintiff pleads that the challenged event contracts "are not . . . 'swaps' within the exclusive jurisdiction of the" CFTC, Pet. ¶¶ 11, 160–64; that "[a] wager on the outcome of a parlay is not a 'swap' as defined in 7 U.S.C. § 1a(47)(A)(ii)," *id.* ¶ 176 n.55; that "[a] wager on the outcome of a proposition bet is not a 'swap' as defined in 7 U.S.C. § 1a(47)(A)(ii)," *id.* ¶ 177 n.59; and that Defendants' event contracts "have no value as a hedging instrument," *id.* ¶ 180 n.63—evidently Plaintiff's way of saying they are not "associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii).

65. In other words, despite burying it in footnotes, Plaintiff "draws on federal law as the exclusive basis for holding Defendants liable . . . for the [allegedly] 'unauthorized'" offering of sports wagers, *Tenn. Gas Pipeline Co.*, 850 F.3d at 722; Pet. ¶¶ 7–8, 11, 160–64, 172–80, for "improper[ly] us[ing]" PM Derivatives LLC's "designation as a [FCM] by" being "the intermediary to receive customer bets and funds," Pet. ¶ 26; and for "improper[ly] us[ing]" QC

Clearing LLC's "DCO registration" by profiting from "users betting on the Polymarket platform," Pet. ¶ 25. While Plaintiff says its claims "arise exclusively under Louisiana law," *id.* ¶ 48, its "claim[s] in fact request[] relief" based on "multiple sources of law that might establish a[n]" actionable basis for a remedy, *Tenn. Gas Pipeline Co.*, 850 F.3d at 722, including CFTC-issued designations that "define[] the scope of [Defendants'] authority," *Handy Land & Timber, LLLP v. Transcon. Gas Pipe Line Co.*, 762 F. App'x 810, 812–13 (11th Cir. 2019).

66. Plaintiff's Louisiana Unfair Trade Practices Act and false-advertising claims (claims two and three) raise the same federal question. Plaintiff's theory of unfairness is that "each Defendant engages in both gambling by computer and sports wagering without appropriate licensure" in "violat[ion] of Louisiana law" and "established public policy . . . as expressed through its duly enacted statutes," Pet. ¶ 221—*i.e.*, "La. R.S. §§ 14:90, 14:90.3, 27:604," Pet. ¶ 213 (claim two). Its theory of deception is that Defendants convey the "impression that the wagers they offer are lawful in Louisiana and are mere 'event contracts' or federally regulated instruments, rather than the illegal sports bets that they are," *id.* ¶ 223, which makes the necessary federal-law allegation explicit, *see* La. Rev. Stat. 14:90.3(M); *supra* pp.23–24. So too for Plaintiff's false-advertising claim, which requires proving that Defendants' advertising of "lawful 'event contracts'" is false "because those offerings are illegal sports wagers under Louisiana law." Pet. ¶ 236.

67. Plaintiff's fourth claim for unjust enrichment, asserted "[i]n the alternative," Pet. ¶ 241, likewise raises the same federal issue. Plaintiff must prove that it suffered "impoverishment" by Defendants' alleged "enrichment" "through illegal sports wagering" and the "[a]bsence of justification or cause"—*i.e.*, that "[t]here is no judicial act, contract, or law that justifies Defendants' enrichment," *id.* ¶¶ 242, 245.

68. In short, each of Plaintiff's claims turn on whether Polymarket US's event contracts are prohibited wagers or valid derivatives transactions under the CEA, and the scope of the CFTC's exclusive jurisdiction in making that determination. That is a substantial federal issue being vigorously litigated by the federal government across the country and which has divided the federal courts of appeals. *See Flaherty*, 172 F.4th at 228; *KalshiEX LLC v. Schuler*, 192 F.4th 664 (6th Cir. 2026).

69. Plaintiff knows this—if not from its participation in other prediction-market litigation, then at least from the lawsuit that Polymarket US filed against the State just two weeks ago. *See* Complaint, *QCX LLC v. Murrill*, No. 2:26-cv-2482 (E.D. La. Oct. 27, 2026), Dkt. 1. Nor was it lost on Plaintiff that the same state law it invoked is expressly inapplicable to federally regulated exchanges. *See* La. Rev. Stat. 14:90.3(M). Plaintiff, however, chose to omit all of this, even as it was subject to a heightened duty of candor when seeking *ex parte* emergency relief. *Cf.*, *e.g.*, Pet. ¶¶ 11–12 (suggesting that courts had uniformly agreed with Plaintiff's position). This Court should not permit Plaintiff to circumvent its jurisdiction through such underhanded tactics.

**ALL REMOVAL REQUIREMENTS ARE MET**

70. Based on the foregoing facts and allegations, this Court has original jurisdiction over this action because Plaintiff's claims are for or relating to actions that Polymarket US took under color of federal office.

71. Based on the foregoing facts and allegations, this Court also has original jurisdiction over this action because the Petition necessarily raises substantial, disputed federal questions that belong in a federal court.

72. Venue is proper in this Court because the United States District Court for the Eastern District of Louisiana is the federal judicial district embracing the 21st Judicial District

Court for the Parish of Tangipahoa, where Plaintiff originally commenced the state court action. 28 U.S.C. §§ 1442(a), 1446(a).

73. Removal is timely because Polymarket US has not yet been served, meaning it necessarily has not been more than 30 days since service of Plaintiff's Petition. 28 U.S.C. §§ 1446(b)(1), (2)(B).

74. Consent of the other named defendants is not required because the federal-officer-removal statute supplies a basis for jurisdiction, and no Defendant has been "properly joined and served." 28 U.S.C. § 1446(b)(2)(A).

75. Copies of all available process, pleadings, and orders are attached hereto as Exhibits A–C. 28 U.S.C. § 1446(a).

76. Polymarket US will provide Plaintiff with written notice of this filing and will promptly file a true and correct copy of this Notice of Removal with the Clerk of the 21st Judicial District Court for the Parish of Tangipahoa. The Notice of Filing of Notice of Removal to be filed with the 21st Judicial District Court for the Parish of Tangipahoa is attached as Exhibit D. 28 U.S.C. § 1446(d).

77. By filing this Notice of Removal, Polymarket US does not waive any objections as to notice, service, personal jurisdiction, venue, or any other defenses. Polymarket US reserves all of its defenses, and this Notice of Removal is filed subject to full reservation of any rights and all objections, arguments, and defenses to Plaintiff's Petition.

## CONCLUSION

78. Polymarket US hereby removes this action and respectfully requests that the Court retain jurisdiction for all further proceedings in this matter.

Respectfully submitted,

Dated: November 13, 2026

*/s/ Hunter J. Schoen*
ADAMS & REESE, LLP
Hunter J. Schoen (#37862)
450 Laurel Street, Suite 1500
Baton Rouge, LA 70801
Telephone: 225.336.5200
hunter.schoen@arlaw.com

Mark R. Beebe, T.A. (#19478)
Christopher J. Kane (#29282)
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: 504.581.3234
mark.beebe@arlaw.com
christopher.kane@arlaw.com

GIBSON DUNN & CRUTCHER LLP
Orin Snyder*
Matt Benjamin*
Rachel Jackson*
Liesel Schapira*
Amanda LeSavage*
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
lschapira@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

**Applications for pro hac vice forthcoming*

*Attorneys for Defendants QCX LLC d/b/a Polymarket US; Blockratize Inc.; QC Tech LLC; QC Clearing LLC; and PM Derivatives LLC*

**CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the Notice of Removal has been served upon the parties listed below via the Court's CM/ECF electronic filing system and electronic mail this 13th day of November, 2026.

- Dawn M. Himel (Bar No. 31007): himeld@ag.louisiana.gov
- Jeremy Gathe (Bar No. 34557): gathej@ag.louisiana.gov
- Sarah Trouard (Bar No. 30313): trouards@ag.louisiana.gov
- Michael Dupree (Bar No. 26870): dupreem@ag.louisiana.gov
- John J. Kelley (Bar No. 35506): kelleyj@ag.louisiana.gov
- Ryan M. Nolan (Bar No. 37244): nolanr@ag.louisiana.gov

*/s/ Hunter J. Schoen*
Hunter J. Schoen (#37862)