**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| STATE OF LOUISIANA, by and through its ATTORNEY GENERAL, LIZ MURRILL | |
| Plaintiff, | **CIVIL ACTION NO.: 2:26-cv-2614** |
| v. | **JUDGE:** |
| KALSHI INC., *et al.* | **MAGISTRATE:** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF ROBINHOOD DEFENDANTS' MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER**

Defendants Robinhood Markets, Inc. ("Robinhood Markets") and Robinhood Derivatives, LLC ("Robinhood" and, together with Robinhood Markets, the "Robinhood Defendants"), by and through their undersigned counsel, hereby respectfully submit this Memorandum of Law in support of their motion to dissolve the *ex parte* temporary restraining order ("TRO") entered on November 12, 2026, by the Louisiana 21st Judicial District Court – Parish of Tangipahoa (the "State Court") in this case, which Defendant QCX LLC d/b/a Polymarket US ("Polymarket US") has since removed to this Court.

Plaintiff State of Louisiana ("Louisiana" or the "State") has sought and obtained extraordinary relief on an unprecedented theory of law that is entirely at odds with the long-established federal system of derivatives regulation. *See* Petition, *Louisiana v. Kalshi Inc.*, No. 2026-0004268 (La. 21st Jud. Dist. Ct. Nov. 12, 2026) ("Pet."); Order Granting TRO, *Louisiana v. Kalshi Inc.*, No. 2026-0004268 (La. 21st Jud. Dist. Ct. Nov. 12, 2026) ("Order").

And the State has done so on an *ex parte* basis—without any effort to provide notice or explain why notice could not be provided. Indeed, when counsel for the Robinhood Defendants repeatedly contacted the State Court clerk's office that day, they were told that no case had yet been docketed. While Defendants scrambled to receive what little information they could about Louisiana's filings from X.com and other unverified online sources, Louisiana obtained sweeping relief designed to shut down an established, multi-billion-dollar industry statewide in the span of just a few hours, with no notification to the Robinhood Defendants and absolutely no emergent need to suddenly obtain relief on an expedited basis to enjoin long-established business activity.

The advent of event contracts trading on federally regulated designated contract markets ("DCMs") was not an overnight phenomenon. As Louisiana itself pleads, Defendants in this action have operated in and around Louisiana for "well over a year now." Pet. ¶ 14. And, all the while, they have done so with the express sanction of the Commodity Futures Trading Commission ("CFTC")—upon which Congress has bestowed "exclusive jurisdiction," under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA"), to regulate trading in futures and similar commodities traded on DCMs. Yet Louisiana now claims that it faces so "immediate and irreparable" an injury, *see* Fed. R. Civ. P. 65(b) (governing TROs), from Defendants' operations that it was unable to provide them with any notice at all of its enforcement efforts in state court. That beggars belief. Indeed, Louisiana's inability to support its claimed need for emergency relief is apparent from its failure to even address the immediacy prong of the standard applicable to an *ex parte* TRO. *See* Pet. That fact alone should be sufficient for this Court to dissolve the TRO. *See* Fed. R. Civ. P. 65(b)(1)(A) (requiring "specific facts" that show harm is both "immediate" and "irreparable"). There are several other reasons that the *ex parte* TRO should be vacated.

*First*, Louisiana offers but a single statutory predicate as a basis for deemed "immediate harm": Louisiana's "gambling by computer" statute, La. R.S. 14:90.3. But that statute, by its own terms, does not reach the conduct the TRO enjoins. Subsection M thereof provides that "[n]othing in this Section shall prohibit, limit, or otherwise restrict the purchase, sale, exchange, or other transaction related to stocks, bonds, futures, options, commodities, or other similar instruments or transactions occurring on a stock or commodities exchange, brokerage house, or similar entity." La. R.S. 14:90.3(M). The event contracts Robinhood offers are exactly such transactions occurring on a commodities exchange. They are swaps and commodity futures under the CEA, and they trade exclusively on DCMs regulated by the CFTC, through Robinhood, a CFTC-registered futures commission merchant ("FCM").

*Second*, even if the carveout in La. R.S. 14:90.3 could somehow be read not to encompass transactions on CFTC-regulated DCMs, the statute still does not reach event contracts because the CEA would preempt state law as applied to transactions involving them. The CEA expressly vests the CFTC with "exclusive jurisdiction" over the offering and trading of commodity futures and similar derivatives traded on DCMs, including swaps. 7 U.S.C. § 2(a)(1)(A). Many event contracts Louisiana seeks to ban are expressly enumerated as "swaps" in the CEA, including "weather," "commodity," "currency" and "interest rate" swaps. *Id.* § 1a(47)(A)(iii). As several federal courts have correctly recognized, the CEA preempts the entire field of futures trading, and it would conflict with the CEA to force DCMs and FCMs to also comply with state gaming regulations when the CFTC's jurisdiction is expressly "exclusive."

*Third,* the sheer scope of the relief Louisiana has sought and obtained renders the TRO entirely indefensible. While courts across the country are divided on whether *sports-related* event contracts constitute "swaps" within the meaning of the CEA, and whether the CEA has preemptive

effect as to state laws applied to such contracts, no court has ever granted—or even seriously considered—the sweeping relief Louisiana has obtained in the TRO: that Defendants must cease offering *all* event contracts. That is because such sweeping relief covers even those event contracts within the heartland of derivatives trading subject to CFTC jurisdiction and which fit neatly into statutorily enumerated categories laid out by Congress—across an entire state. Allowing Louisiana to retain such sweeping relief, on an irregular, inequitable posture, and to the detriment of law-abiding businesses across an entire industry, would set an unthinkable precedent.

For each and all of these reasons, the TRO should be dissolved. Perhaps this Court will ultimately decide that an injunction should issue against some subset of event contracts, or perhaps it will not. Each outcome has precedent in the ongoing national battle between the CFTC and the entities it regulates, and the states seeking to upend that system. Whatever the outcome, that relief should come only after a careful consideration of the relevant issues and an opportunity for all parties—including Louisiana—to be heard. Louisiana has sat back and taken no action for more than a year; there is no justification for the *ex parte* TRO.

## BACKGROUND

In 1974, Congress gave the CFTC "exclusive jurisdiction" over "contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title," and in 2010 Congress extended that grant to "transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). Congress did so to prevent the "chaos" that would result from multiple states applying their own laws to federally regulated exchanges, and it preserved state authority only over transactions "not conducted on or subject to the rules of" a CFTC-regulated exchange.

*Id.* § 16(e)(1)(B)(i).[1] Congress extended that exclusive jurisdiction to event contracts traded on DCMs in 2000, when it added and defined "excluded commodity," and again in 2010, when it added and defined "swap." *Id.* § 1a(19)(iv), (47)(A)(ii).

In March 2025, Kalshi filed a lawsuit against the State of Nevada after receiving a cease-and-desist letter claiming that its federally regulated DCM event contracts business violated state law. *See KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev. Mar. 28, 2025). In the months since, litigation over event contracts has been filed by or against no fewer than twenty-three states. The CFTC is a party in eleven of those states and has filed ten lawsuits of its own in support of event contract trading on DCMs. The Third, Sixth and Ninth Circuits have all issued rulings, which are split, on the preemption issues, and there are multiple petitions for writs of certiorari currently pending before the United States Supreme Court. For over eighteen months, this has been a very public, heavily covered nationwide battle between the states, and the event contracts industry and the CFTC.

On November 12, 2026, apparently with no advance notice to any Defendants (certainly with no notice whatsoever to the Robinhood Defendants), Louisiana sued the Robinhood Defendants and more than two dozen other DCMs, FCMs and affiliates in the State Court (collectively, "Defendants"). *See generally* Pet. In its Petition, Louisiana asserts claims for false advertising, La. R.S. 51:411, unjust enrichment, La. Civ. Code art. 2298, and violations of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1405. *See id.* But its request for a TRO rests on alleged violations of the gambling-by-computer statute, La. R.S. 14:90.3, which the Louisiana

[1] Congress's fears were well-founded. The history reflects a tradition of states trying to regulate trading in commodity futures and derivatives as gambling. *See, e.g.*, *Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").

Attorney General may enforce through injunctive relief under La. R.S. 27:19.1(G) and 27:19.2. *Id.* at 58-59; Order at 1-3. The same day, also without notice to Defendants, the State Court entered an *ex parte* TRO finding that all Defendants "are currently violating La. R.S. 14:90.3" and enjoining them from offering, brokering or facilitating any "event contract" for persons located in Louisiana through "'gambling by computer' as defined in La. R.S. 14:90.3(B)." Order at 2-3.

Robinhood is a CFTC-registered FCM that offers users the ability to trade event contracts through its platform—although the event contracts themselves are always executed on a DCM. Robinhood Markets is the parent entity and sole owner of Robinhood. Event contracts offered by Robinhood cover various subjects, including:

- <u>Commodities</u>: For example, Will the price of natural gas on November 30, 2026 at 5 pm ET exceed $3.499, $3.699 or $3.999?
- <u>Finance</u>: For example, Will the 10-year U.S. Treasury yield on November 30, 2026 exceed 4.61%, 4.81% or 5.05%?
- <u>Cryptocurrency</u>: Will the price of Ethereum, by the end of 2026, fall below $750, $1,250 or $1,500?
- <u>Climate</u>: For example, Will it rain on November 14 or 15, 2026 in Albuquerque, Phoenix and/or Denver?
- <u>Technology/Science</u>: For example, Will the U.S. grant a license for a new nuclear reactor before 2027? Or, Will the FDA approve any psychedelic substance for medical use before 2027?
- <u>Politics</u>: For example, Will there be a recession in 2027?
- <u>Entertainment</u>: For example, Will Harry Styles streams in 2026 be above 7.75B, 8.25B or 8.5B? Or, Will the top Netflix movie this week be The Day After Tomorrow, A Dog's Perfect Christmas, or Animals?
- <u>Sports</u>: For example, Will the Saints win the 2027 Pro Football Championship?

The various other Defendants in this case are largely owners or operators of their own DCMs or FCMs, many of which offer a similarly broad swath of event contracts.

## ARGUMENT

Upon removal, the *ex parte* TRO, like "all injunctions, orders, and other proceedings" issued by a state court, "remain[s] in full force and effect until dissolved or modified by" this

Court. 28 U.S.C. § 1450; *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local 70 of Alameda Cty.*, 415 U.S. 423, 436 (1974) ("After removal, the federal court takes the case up where the State court left it off." (quotation omitted)).

Because the TRO is an interlocutory order, it "remains subject to reconsideration just as it had been prior to removal." *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1303 (5th Cir. 1988). This Court therefore "has the authority to dissolve the TRO." *Am. First Commc'ns, Inc. v. BellSouth Telecomms., Inc.*, No. CIV. A. 99-0972, 1999 WL 203265, at *1 (E.D. La. Apr. 7, 1999).

An *ex parte* TRO may be issued only if—

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b).

Louisiana cannot show any immediate and irreparable injury, much less that any harm would result before Defendants can be heard. In pleading irreparable harm, Louisiana relies solely on a statutory provision that "conclusively" deems a violation of the Louisiana Gaming Control Law to be "irreparable harm." Pet. ¶ 212 (citing La. R.S. 27:19.2(A)). That presumption arises only if there is an actual violation of La. R.S. 14:90.3. There is none, because the statute contains an express carveout for Defendants' conduct, *see infra* Part I, and, in any event, Louisiana's enforcement attempt is preempted by federal law, *see infra* Part II.

## I. Louisiana's Gambling Statute Expressly Excludes Transactions on CFTC-Regulated Exchanges

The TRO depends entirely on the premise that Defendants are engaged in "gambling by computer" under La. R.S. 14:90.3(B). Order at 2-3. But the Legislature expressly limited that

statute's reach: "Nothing in this Section shall prohibit, limit, or otherwise restrict the purchase, sale, exchange, or other transaction related to stocks, bonds, futures, options, commodities, or other similar instruments or transactions occurring on a stock or commodities exchange, brokerage house, or similar entity." La. R.S. 14:90.3(M). The carve-out is dispositive here for two reasons.

*First*, event contracts traded on DCMs are "futures, options, commodities, or other similar instruments or transactions" occurring on a commodities exchange. *Id.* Under the CEA, a "swap" includes "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The event contracts Robinhood offers—on commodity prices, interest rates, weather, regulatory approvals and other subjects—are yes-or-no contracts that pay out based on the occurrence or nonoccurrence of such events or contingencies. They are therefore "swaps." *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026) (event contracts "traded on a CFTC-licensed DCM" that "depend on event outcomes associated with economic consequences . . . fit within the [CEA's] definition of 'swaps'"). Many of them are also swaps under a separate provision, 7 U.S.C. § 1a(47)(A)(iii), which expressly enumerates categories such as "weather," "commodity" and "interest rate" swaps—a provision that the courts addressing sports-related event contracts have not had occasion to analyze. Alternatively, they are contracts for future delivery of "excluded commodities," which include "an occurrence, extent of an occurrence, or contingency . . . that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). They are, therefore, certainly "similar instruments or transactions."

The TRO's own definition of "event contract" confirms this point. The TRO restrains the offering of "any 'event contract,'" which it defines as "any sum of money or representation of value risked by a person on an occurrence associated with an event for which the outcome is uncertain." Order at 2-3. When the occurrence is associated with an actual or potential financial, economic or commercial consequence, that is a swap. 7 U.S.C. § 1a(47)(A)(ii). Consider as an example one event contract offered through Robinhood: "Will the U.S. grant a license for a new nuclear reactor before 2027?" Customers take a yes-or-no position. Those who buy the "yes" position receive a payout if and only if the U.S. Nuclear Regulatory Commission issues a license for a new nuclear reactor before the contract expires on January 1, 2027; otherwise, those holding the "no" position receive the payout. Either position "risk[s]" a "sum of money . . . on an occurrence associated with an event for which the outcome is uncertain," so the contract falls within the scope of the *ex parte* TRO. Order at 2-3. But the contract is also a swap. It is "dependent on the occurrence [or] nonoccurrence" of an "event or contingency"—whether a new reactor is licensed within a given timeframe—and the "financial, economic, [and] commercial consequence[s]" of that event are manifest: a new reactor affects energy supply and prices, local employment and natural resources. 7 U.S.C. § 1a(47)(A)(ii).

The overlap between the TRO and the CEA is starker still for event contracts in categories the CEA expressly enumerates as "swaps." *Id.* § 1a(47)(A)(iii). This subsection of the CEA defines "swap" to include any agreement, contract or transaction that "provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the

parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset . . . or liability that incorporates the financial risk so transferred." *Id.* This definition is followed by a list of example types of "swaps" that are understood to fit this definition, including "weather," "commodity," "currency" and "interest rate" swaps. *Id.*

Prior to the *ex parte* TRO, Robinhood offered its customers exactly these types of swaps in Louisiana. Take "Will the price of natural gas on November 30, 2026 at 5 pm ET exceed $3.999?" The "buyers" and "sellers" of this contract (taking opposing "yes" or "no" positions, respectively) each acquire a contingent interest in the value of the contract, which is ultimately determined by the "future change" in "value" of the "commodit[y]" concerned (here, natural gas). Being able to trade the contract freely, learning from the market's assessment of the likelihood that the considered value will reach a given threshold, enables the "parties to the transaction" to "transfer" between themselves "the financial risk" of the possible changes they contemplate. That is a classic risk-hedging function performed by futures trading, and the event contract structured around the foregoing question is a quintessential "commodity swap."

But that same contract is also a prohibited "event contract" under the TRO: the buyer of the "yes" position risks a sum of money that the price of natural gas will exceed the listed threshold, and the seller takes the mirror-image risk. The same is true for weather swaps ("Will it rain on November 14 or 15, 2026 in Albuquerque?") and interest rate swaps ("Will the 10-year U.S. Treasury yield on November 30, 2026 exceed 4.61%?") and currency swaps ("Will the open price of the Euro/Dollar, fall below 1.10 by the end of the year?"), among others offered through Robinhood and/or the FCMs and DCMs owned and operated by the other Defendants.

In short, whether they are characterized as swaps or as transactions in excluded commodities, the event contracts the TRO enjoins fall squarely within the "futures, options, commodities, or other similar instruments or transactions" that Subsection M of La. R.S. 14:90.3 expressly carves out from the state-law statutory prohibition.

Even if the Court were to conclude that some event contracts do not fit precisely within the CEA's definitions of "swap" or "excluded commodity," those event contracts would still fall within Subsection M. The carve-out is not limited to "futures, options, [and] commodities"; it extends expressly to "other similar instruments or transactions." La. R.S. 14:90.3(M). Event contracts listed on CFTC-designated contract markets, subject to the CFTC's certification and review process, and intermediated by CFTC-registered FCMs are, at a minimum, "similar" to futures and options: they are exchange-traded derivatives that are listed, priced, traded and settled in the same manner and under the same federal oversight. *See* 7 U.S.C. § 7a-2(c); 17 C.F.R. §§ 40.2, 40.11.

Reading Subsection M to exclude these transactions would also pose serious fair notice problems for CFTC-regulated entities and their customers. La. R.S. 14:90.3 is a criminal statute, and in facilitating event contract trading on DCMs, Robinhood has reasonably relied on and followed the federal statutory and regulatory framework that expressly authorizes its conduct. *See United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996) ("The defense of entrapment by estoppel is applicable when a government official or agent actively assures a defendant that certain conduct is legal and the defendant reasonably relies on that advice and continues or initiates the conduct."). Even if Subsection M were ambiguous as to event contracts traded on DCMs (it is not), it was reasonable for Robinhood to operate on the understanding that its federally authorized business falls within the carve-out for "similar instruments or transactions occurring on a . . . commodities

exchange, brokerage house, or similar entity," La. R.S. 14:90.3(M), and the TRO should be dissolved for that reason as well.

*Second*, these transactions "occur[] on a . . . commodities exchange, brokerage house, or similar entity." *Id.* Every event contract Robinhood offers is executed on a DCM—a board of trade that the CFTC has designated as a contract market under federal commodities law and that must comply with the CEA's core principles and the CFTC's regulations. 7 U.S.C. §§ 2(e), 7; 17 C.F.R. § 38.3(a). A DCM is a "commodities exchange" in every sense. And Robinhood, as a CFTC-registered FCM, is precisely the kind of "brokerage house, or similar entity" through which such transactions are placed. *See* 7 U.S.C. §§ 1a(28), 6f.

Subsection M thus completely forecloses the State's theory on the face of the statute. The Legislature knew how to exclude particular activities from the statute's reach, *see* La. R.S. 14:90.3(F)-(K), and it chose to exclude transactions in futures, options and commodities *and similar transactions* on stock or commodities exchanges or brokerage houses, without qualification. Subsection M also turns on where a transaction occurs, not on how other courts may ultimately classify it under federal law: however the questions pending in other jurisdictions are resolved, these contracts are, in fact, executed today on CFTC-designated commodities exchanges. To the knowledge of the Robinhood Defendants, no court has ever applied La. R.S. 14:90.3 to transactions on a CFTC-regulated DCM. Because the conduct enjoined is not "gambling by computer" by definition, Louisiana has no claim under La. R.S. 14:90.3 and is not entitled to injunctive relief.

## II. The CEA Preempts Louisiana Gambling Laws as Applied to Event Contracts Traded on DCMs

Regardless of La. R.S. 14:90.3's carve-out, or if its carve-out were held not to apply to swaps or transactions in excluded commodities, as described above, it still could not validly be applied to event contracts traded on DCMs. Under the CEA, the CFTC has "exclusive jurisdiction" over swaps and commodity futures traded on DCMs. 7 U.S.C. § 2(a)(1)(A). Because the event contracts at issue are swaps or transactions in excluded commodities, *see supra* Part I, the CEA preempts Louisiana's gambling laws as applied to them under each of the express, field, and conflict preemption rubrics. *See Oneok*, *Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015).

*Express preemption.* When Congress vested the CFTC with "exclusive jurisdiction" over "transactions involving swaps or contracts of sale of a commodity for future delivery" traded on DCMs, 7 U.S.C. § 2(a)(1)(A), it expressly preempted the application of state law to those transactions. The ordinary meaning of "exclusive" is "not divided or shared by others," American Heritage Dictionary 458 (1st ed. 1973), and a grant of exclusive jurisdiction "necessarily denies jurisdiction" to anyone else, *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). As the Ninth Circuit recently recognized, Congress explicitly exercised the power to expressly preempt state law with regard to swaps "traded or executed on" a DCM based on two independent textual grounds. *See KalshiEX LLC v. Assad*, 190 F.4th 1098, 1109 (9th Cir. 2026) ("§ 2 of the CEA includes an express preemption provision granting the CFTC 'exclusive jurisdiction' over all 'transactions involving swaps' that are 'traded or executed on a market designated' by the CFTC."). *First*, the CEA "confers exclusive jurisdiction on the CFTC, which excludes all others" as the "description of . . . jurisdiction as exclusive necessarily denies jurisdiction to other entities, which follows from the plain meaning of 'exclusive.'" *Id.* at 1110 (quotation omitted); *see also*

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (state-law "commercial gambling" claim could not proceed because "the Commodity Exchange Act preempts all state laws inconsistent with its provisions"). Similarly worded grants of jurisdiction are regularly held to preempt state law. *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66 (9th Cir. 2018) (describing grant of "exclusive" jurisdiction as a "broad and general" preemption provision); *accord Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that "exclusive jurisdiction" provision preempts state law claims). And, *second*, the saving clause in § 2(a)(1)(A) "shows that Congress meant it to be a preemptive provision." *Assad*, 190 F.4th at 1110. The savings clause provides that "'*[e]xcept as hereinabove provided*, nothing contained in this section shall . . . supersede or limit the jurisdiction [of] . . . other regulatory authorities under the laws of the United States *or any State.*'" *Id.* (quoting 7 U.S.C. § 2(a)(1)(A)). As the Ninth Circuit explained, unless Congress intended for § 2(a)(1)(A) to have preemptive effect as to the states, this language would be superfluous—a result the panel rightly rejected. *Id.* Indeed, Congress added that language specifically to ensure that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 23 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5848. And the CEA expressly preserves state authority only over transactions "not conducted on or subject to the rules of" a CFTC-regulated exchange. 7 U.S.C. § 16(e)(1)(B)(i).

The Ninth Circuit's reasoning is consistent with that of other courts that have repeatedly found that the CEA's grant of exclusive jurisdiction to the CFTC preempts other regulatory schemes, including state law and other federal statutes such as the Natural Gas Act. *See Flaherty*, 172 F.4th at 229-30; *United States v. Minnesota*, No. 26-cv-2661, 2026 WL 2150211, at *14 (D. Minn. July 27, 2026) (finding plaintiffs likely to succeed on express-preemption claims because

"Minnesota law will [likely] regulate [event contract] transactions over which the CFTC has 'exclusive jurisdiction'"); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 206-07 (N.D. Ala. 1981) (finding that the CEA preempted the application of Alabama gaming law); *Hunter v. FERC*, 711 F.3d 155, 158-59 (D.C. Cir. 2013) (Federal Energy Regulatory Commission lacked jurisdiction in light of CFTC's exclusive jurisdiction).

*Assad* also accords with the Supreme Court's companion decisions in *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), and *Rice v. Board of Trade*, 331 U.S. 247 (1947), which confirmed the significance of Congress's choice to use the phrase "exclusive jurisdiction" in its subsequent 1974 amendment to the CEA. In *Santa Fe*, the Court held that the United States Warehouse Act's grant of "exclusive" jurisdiction to the Secretary of Agriculture preempted state law. 331 U.S. at 232-38. But, in *Board of Trade*, the Court concluded the original CEA did *not* preempt state law because it lacked a similar "declaration" (as the Warehouse Act) that its "federal scheme" for "trading on contract markets [wa]s exclusive of state regulation." 331 U.S. at 253. In 1974, Congress amended the CEA and provided the precise term—"exclusive"—that the Court in *Board of Trade* held was missing from the CEA. Congress's grant of "exclusive jurisdiction" to the CFTC addressed the precise gap the Court identified.

*Field preemption.* The CEA also occupies the field of transactions on federally regulated DCMs. The Supreme Court has recognized that the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)). Exchanges may attain DCM status only after demonstrating compliance with federal core principles and regulations, 7 U.S.C. § 7(d); 17 C.F.R. pt. 38; FCMs must register with the CFTC and comply with comprehensive federal requirements, 7 U.S.C. § 6f; 17 C.F.R. §§ 1.17, 3.10(c);

and listed contracts remain subject to the CFTC's continuing oversight, including its authority under the "Special Rule" to determine whether event contracts are contrary to the public interest, 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11. Congress thus did "not contemplate that there will be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897. To be clear, the preempted field is on-DCM transactions, not sports betting or gambling generally, which remain subject to state regulation off DCMs. Indeed, the Third Circuit held that Congress had impliedly preempted state law as to "the regulation of trading on a DCM (a form of futures trading)." *Flaherty*, 172 F.4th at 229. In other words, the Third Circuit found that Congress, through the CEA, "occupies [the] field" of futures "regulation so comprehensively that it has left no room for supplementary state legislation." *Id.* at 228 (quotation omitted).

The CFTC has long taken the position that its "exclusive jurisdiction" extends to the whole field of futures trading, including event contracts, and over the past year it has been explicit on this point. As early as 2024, the CFTC acknowledged that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant's Br. at 27, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024). Its June 2026 Notice of Proposed Rulemaking ("NPRM") sets out that the CEA provides for a "comprehensive federal regulatory framework" that preempts all conflicting state law and confirms that all event contracts traded on DCMs, or facilitated by FCMs including Robinhood, are derivatives subject to exclusive CFTC jurisdiction. *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,808 (proposed June 12, 2026). More recently, two filings in October 2026—an Interim Final Rule and another NPRM—addressed the definition of "swap," clarifying respectively that "casino-style gambling products" and transactions with "licensed sportsbooks" are excluded from the term, *Further*

*Definition of "Swap" to Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65,969, 65,977, 65,979 (Oct. 19, 2026), while proposing that event contracts based on "sports-, politics-, cultural-, and weather-related events" are included, *Further Definition of "Swap"–Inclusions*, 91 Fed. Reg. 66,022, 66,025-27 (proposed Oct. 19, 2026). Besides its active rulemaking, the CFTC, alongside the U.S. Department of Justice (on behalf of the United States), has filed suit in at least ten states, and intervened or filed amicus briefs in several other cases, to protect its exclusive jurisdiction.

*Conflict preemption.* "[C]onflict preemption also prohibits [states] from regulating sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 229. Conflict preemption arises either "when it is impossible to obey both state and federal requirements" or "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.*, 134 F.4th 326, 329 (5th Cir. 2025) (quotation omitted). Both apply here. Congress's purpose in granting the CFTC exclusive jurisdiction was "to do away with the patchwork of state regulations and bring futures trading on DCMs under the exclusive jurisdiction of the CFTC." *Flaherty*, 172 F.4th at 230. Applying Louisiana's gambling laws to bar huge swaths of trading on DCMs would recreate "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Id.* And because the Special Rule vests the CFTC with authority to approve or prohibit certain types of event contracts as contrary to the public interest, 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2), Louisiana's attempt to ban the very contracts the CFTC has permitted to trade creates a direct conflict and is "at odds with achievement of the federal decision about the right degree of pressure to employ." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000).

The conflict is illuminated further by recent CFTC guidance relating to the CEA's "impartial access" requirement, *see* 7 U.S.C. § 7(d)(9)(A), in which the CFTC clarified that

“[d]erivatives markets must operate on a uniform basis at a national scale in order to achieve the CEA’s purpose” of “provid[ing] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities.” *DCM Impartial Access Requirements*, 91 Fed. Reg. 72,407, 72,409 (Nov. 10, 2026) (to be codified at 17 C.F.R. pt. 38) (quotation omitted). The CFTC’s interpretative guidance as to its own regulations insists that DCMs cannot impose geographical restrictions on access, *id.*, and demands precisely the inverse of what the TRO mandates—that the Defendants who own or operate DCMs and FCMs “geofence the State of Louisiana,” Order at 3. As Defendants cannot comply with both federal and state law, the state law must give way. *See generally* U.S. Const. art. VI, cl. 2.

## III. No Court Has Awarded Any State, and No State Has Sought, the Sweeping Relief Louisiana Has Sought and Obtained in This Action

While the question of whether the CEA preempts parallel state regulation of federally regulated event contracts is actively being litigated in courts across the country, no other court has awarded any state the sweeping injunctive relief Louisiana has sought and obtained here, let alone on an *ex parte* basis.

Some courts have correctly recognized that state regulation of federally regulated event contracts violates the Supremacy Clause and that sports-related event contracts are “swaps.” *See Flaherty*, 172 F.4th at 228; *Coinbase Fin. Mkts., Inc. v. Raoul*, No. 1:25-CV-15406, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026); *Minnesota*, 2026 WL 2150211, at *15. Robinhood respectfully submits that this Court should follow that line of cases.

Although other courts have reached the opposite conclusion—that sports-related event contracts likely are not swaps (and are therefore not encompassed by the CEA’s preemptive

scope)—even those decisions are limited to sports-related event contracts only. *See Assad*, 190 F.4th at 1113-16; *KalshiEX LLC v. Schuler*, 192 F.4th 664, 686-87 (6th Cir. 2026); *KalshiEX LLC v. Bird*, 2026 WL 2691009, at *12 (S.D. Iowa Sept. 8, 2026), *appeal filed*, No. 26-2874 (8th Cir. Sept. 17, 2026). In such cases, the courts' analyses have turned principally on whether the outcomes of sporting contests are "events" or "contingencies," and whether those sporting events are sufficiently "associated with" "financial, economic or commercial consequences" to fall within the statutory definition of "swaps" or transactions in excluded commodities. *See Assad*, 190 F.4th at 1113-16; *Schuler*, 192 F.4th at 686-87.

But the *ex parte* TRO sweeps far more broadly than any other decision across the country. The bases for those court decisions are irrelevant to a large proportion of event contracts Louisiana seeks to sweep up within the scope of its overbroad TRO here because many of those event contracts cannot reasonably be challenged as falling outside the definition of a swap given that the CEA expressly enumerates them as "swaps," including "weather," "commodity," "currency" and "interest rate" swaps. 7 U.S.C. § 1a(47)(A)(iii). For those, no further statutory analysis is required to determine whether the contract is a swap because Congress itself made that determination when it defined these categories as swaps. *See id.*; *cf. Assad*, 190 F.4th at 1113-16 (analyzing only whether sports-related outcomes satisfy § 1a(47)(A)(ii)). Presumably because the position taken by Louisiana is so clearly wrong and contrary to federal law, no other state, and by extension no court, in the ongoing litigation around the country has even attempted to contend that all event contracts—including those in the heartland of the CEA's "exclusive jurisdiction" that are specifically enumerated in the definition of "swap"—are subject to state regulation.[2]

---

[2] Moreover, many of these cases are currently being appealed, including in the Second, Fourth, Seventh, Eighth and Tenth Circuits. *See KalshiEX LLC v. Williams*, No. 26-1835 (2d

## IV. Louisiana Fails to Show That Irreparable Injury Will Result Absent a TRO

As noted above, Louisiana's sole proffered basis to demonstrate the risk it faces of "immediate and irreparable injury," Fed. R. Civ. P. 65(b), is a single statutory provision deeming certain conduct to be *per se* "irreparable harm," La. R.S. 27:19.2(A). Even if this *ipse dixit* covered Defendants' conduct—and by the plain terms of the statute, it does not—it would not suffice to meet "the high standards found in Fed. R. Civ. P. 65(b)." *Esparza v. Bd. of Trs.*, No. 98-50907, 1999 WL 423109, at *2 (5th Cir. June 4, 1999).

*First*, Louisiana offers no explanation for why the risk of harm is "immediate"—and this is enough to halt the analysis. *See* Pet.; *see also James v. Parish*, No. CV 22-5233, 2022 WL 17830464, at *9 (E.D. La. Dec. 21, 2022) (in the context of Rule 65, "[a] Court need not address each element if a plaintiff fails to meets [sic] its burden of establishing any one element").

*Second*, any claim Louisiana may have made in regard to the immediacy prong would be belied by the nature of this action. By Louisiana's own pleading, event contracts have been offered by Defendants in Louisiana "for well over a year." Pet. ¶ 14. Yet, Louisiana has taken no enforcement action this entire time and only seeks relief now—citing no "irreparable harm" other than a statutory presumption that already existed when Defendants began offering event contracts in Louisiana.

---

Cir. July 8, 2026); *KalshiEX LLC v. Martin*, No. 25-01892 (4th Cir. Aug. 1, 2025); *KalshiEX LLC v. Raoul*, No. 26-3267 (7th Cir. Nov. 2, 2026); *United States v. Wisconsin*, No. 26-2636 (7th Cir. Aug. 10, 2026); *KalshiEX LLC v. Bird*, No. 26-2874 (8th Cir. Sept. 17, 2026); *KalshiEX LLC v. Cox*, No. 26-4100 (10th Cir. Aug. 5, [2026]). And there are three petitions for writ of certiorari pending before the United States Supreme Court. *See Flaherty*, 172 F.4th 220, *petition for cert. filed*, No. 26-299 (U.S. Sept. 2, 2026); *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-7831, 2026 WL 2546925 (9th Cir. Aug. 28, 2026), *petition for cert. filed*, No. 26-338 (U.S. Sept. 10, 2026); *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187, 2026 WL 2546926 (9th Cir. Aug. 28, 2026), *petition for cert. filed*, No. 26-344 (U.S. Sept. 11, 2026).

*Third*, Louisiana's allegations against the Defendants do not rise to the level of the "clear[] show[ing]" necessary under Fed. R. Civ. P. 65(b). Beyond asserting that Defendants use "clever word play" to mask that their offering of event contracts constitutes the facilitation of gambling, Pet. ¶¶ 7-8, the State offers no explanation as to why offering event contracts—let alone core commodity swaps, as described above—permits enforcement under the State's gambling laws. Specifically, it does not explain how Defendants are liable under La. R.S. 14:90.3, the violation of which is the sole predicate for the statutory presumption of "irreparable harm" under La. R.S. 27:19.2(A). Rather, the State focuses only on the fact that gambling itself is a harmful activity. *See generally* Pet. at 16, 53-57. But, as this Court explained only a week ago, "generalized concerns . . . do not implicate the immediacy or irreparable injury requirements," and "Rule 65 and the case law applying it demands more." *Beckham v. Bruno*, No. CV 26-2215, 2026 WL 3371932, at *4, *7 (E.D. La. Nov. 6, 2026).

Accordingly, the State lacks a valid, enforceable statutory basis to sustain its claim of *per se* "irreparable harm" and fails to offer "specific facts" that "clearly show that immediate and irreparable injury will result" absent the TRO. Fed. R. Civ. P. 65(b). As a result, the grant of the TRO is improper. The restraints imposed by the State Court on access to DCMs and FCMs by Louisiana customers, as well as on the offering of federally regulated event contracts within state boundaries, clearly conflict with federal law. Upon reconsideration, which is within this Court's authority, *see* Fed. R. Civ. P. 65(b)(4), the State Court's *ex parte* TRO should be dissolved.

**CONCLUSION**

For all of the foregoing reasons, the Robinhood Defendants respectfully request that the Court dissolve the TRO.

{signature page follows}

Respectfully submitted this 14th day of November,

*/s/ Adam B. Zuckerman*

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Aubrey B. Hirsch, Jr., T.A. (LA # 06948)
Adam B. Zuckerman (LA # 25943)
Lauren Brink Adams (LA # 37052)
365 Canal Street, Suite 3100
New Orleans, LA 70130
Tel: (504) 566-5200
Email: ahirsch@bakerdonelson.com
azuckerman@bakerdonelson.com
lbrink@bakerdonelson.com

Antony L. Ryan*
Kevin J. Orsini*
Brittany L. Sukiennik*
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 474-1000
Email: aryan@cravath.com
korsini@cravath.com
bsukiennik@cravath.com

**pro hac vice forthcoming*

*Counsel for Defendants Robinhood Markets, Inc. and Robinhood Derivatives, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 14, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which sends notification to all counsel of record for the removing parties, and a copy was served on all other counsel of record via email.

*/s/ Adam B. Zuckerman*